UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RICHARD LOUIS MARCRUM,               )
                                     )
            Petitioner,              )
                                     )
      vs.                            )        Case No. 4:02CV01167 AGF
                                     )
AL LUEBBERS,                         )
                                     )
            Respondent.              )

**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court on the petition of Missouri state prisoner Richard

Marcrum for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  For the reasons set

forth below, habeas relief shall be granted on the ground that trial counsel rendered

constitutionally ineffective assistance in failing to competently present diminished-

capacity and insanity defenses.

Petitioner was convicted by a jury in the Circuit Court of Jefferson County,

Missouri, of first-degree murder and armed criminal action, arising out of the June 3,

1994 murder of Kenneth Reeves.  Petitioner was sentenced to a term of life imprisonment

without the possibility of parole, and life imprisonment, respectively.  The Missouri

Court of Appeals affirmed Petitioner's convictions and sentences.  His motion for post-

conviction relief was denied by the trial court, and this denial was affirmed on appeal.

_____

[1]     The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

In the present habeas action, Petitioner claims that his constitutional right to the effective assistance of trial counsel was violated due to counsel's failure to (1) competently present insanity/diminished-capacity defenses; (2) object to the state's improper closing argument; and (3) file a timely motion for a new trial and thereby preserve trial errors for appeal.

By Order dated September 11, 2003, this Court rejected Respondent's argument that the petition in this case was time-barred. Doc. #23. Respondent now argues that habeas relief should be denied because the state courts' adjudication of Petitioner's claims did not involve an unreasonable application of federal law or an unreasonable determination of the facts.

## BACKGROUND

Petitioner, who was 30 years old at the time, was arrested on the day of the murder, and was initially represented by a public defender. On December 7, 1994, retained counsel, Alfred Speer, entered his appearance, and on December 29, 1994, counsel filed a notice of intent to rely on a defense of a mental disease or defect. Trial commenced on June 3, 1996.

### Evidence at Trial

The sufficiency of the evidence is not at issue. The evidence presented at trial established the following: On June 3, 1994, the Rev. Kenneth Reeves, who was in his early 60s and had been a paraplegic for about two years, was battered with a fire poker in his home, and died two days later as a result. At noon on the day of the attack, Petitioner's

car was observed in front of the victim's home.  At approximately 2:30 p.m., the car was still parked there, and Petitioner was seen standing next to it.  Neighbors of the victim were driving by and pulled up alongside Petitioner and asked if they could help him.  Petitioner responded, "Praise the Lord, I just killed one sorry son-of-a-bitch and I will get another."  When asked to repeat what he had said, Petitioner did so.  Tr. at 196-213.

The neighbors left, but returned shortly to find that Petitioner and his car were gone.  Upon entering the victim's home, they found the victim laying on the floor next to his overturned wheelchair, breathing heavily and bleeding from his head.  A broken fire poker with blood on it was near the door, and blood was splattered throughout the room and pooling under the victim.  Tr. at 213-24.  The victim was admitted to the hospital with multiple lacerations of the skull, a depressed skull fracture (pieces of the skull driven into the brain), and cerebral contusions.  He died two days later.  Tr. at 376-77.  The autopsy established that the cause of death was blunt trauma to the head, that the injuries were consistent with having been struck by a fire poker at least three times, and the death was a homicide.  Tr. 286, 304-06.

Petitioner's parents and brother testified that Petitioner lived with his parents at the time of the attack.  He had had a series of seizures on the day before the murder, and on the morning of the murder had accused his mother of trying to poison him and left the house at about noon.  He returned home at about 5:00 p.m., saying that he was God and was going to take people to the kingdom of heaven.  Tr. at 791-804.  Petitioner then went out on the sidewalk in front of the house and began quoting from the "Bible," which was

actually a real estate magazine.  His parents brought him back inside and called an ambulance.  Tr. at 964.

At 8:40 p.m., paramedics were dispatched to Petitioner's home for "a possible violent psych case."  One of the paramedics testified that upon arrival, Petitioner's mother told them that Petitioner had been drinking and had been off his Dilantin for two or three days.  Petitioner appeared dazed, and the paramedic attributed this to alcohol.  Tr. at 941-49.  The court read a stipulation to the jury stating that a blood test performed on Petitioner at the time of his admittance to the hospital indicated that Petitioner had a blood alcohol content of 0-10 milligrams per deciliter.[2]  Tr. at 1063.  The import of this number was not related to the jury, although during closing argument defense counsel stated that it showed that Petitioner was not intoxicated at the time.

Meanwhile, the victim's wife named Petitioner as someone she thought might have been the attacker, and several police officers and one of the neighbors who had spoken to Petitioner earlier in the day went to Petitioner's home.  The neighbor identified a car parked in front of Petitioner's home as the one he had seen earlier that day in front of the victim's house.  When the officers were informed that Petitioner had been taken to the hospital, they proceeded there and found Petitioner.  One of the officers identified himself, at which point Petitioner stated, "I know why you're here, it's because of George.  I killed George.  I killed George.  I killed George in Kimmswick.  He also goes by the name of

---

[2]   Blood alcohol content is the measure of the weight of alcohol in milligrams compared to a given volume of blood, usually in deciliters.

Kenny Reeves." Tr. at 405-09.  Petitioner also stated that the victim "was a bad man and that he deserved to be killed because he was evil and it would be found out that he was evil." Tr. at 410.  The officers arrested Petitioner and seized his clothing.  DNA analysis showed that splatters of blood on the clothing were consistent with the victim's blood.  Tr. at 410-12, 505.  In the car on the way to the Sheriff's Department, Petitioner stated that he had no problem going to Hillsboro, but he did not want to go to Kimmswick because he had done something bad in Kimmswick, and that it was going to be alright when everything came out because Kenny Reeves was a bad man.  He also stated that he had been molested when he was younger.  Tr. at 415.

Over defense counsel's objection, the prosecutor was permitted to play an audiotape of a rather lengthy phone conversation between Petitioner and the victim's wife.  The conversation apparently took place approximately seven years before the murder, although the time frame is never made clear.  Tr. at 11, 548, 579.  In the conversation, Petitioner asked for $110 and said that unless it is given to him, he would expose that the victim and his wife are both gay, and that the victim had had sex with a 14-year-old boy.  The victim's wife made only two statements during the conversation.  She said "There is no money" repeatedly, and occasionally asked Petitioner if he was making a threat.  Petitioner stated several times that he was not making any threats, but that he had a feeling that something was going to happen to the victim (implying that he would be arrested for the alleged molestation of the 14-year-old boy).  At one point, however, Petitioner stated that he was making a threat, and that he would "stomp" the victim the next day in church.

Toward the end of the conversation, Petitioner stated that if something happened to him, he would have the victim's house burned down with the victim and his wife in it. Attachment to Resp. Ex. D.[3]

Petitioner testified at trial that he had known the victim for ten years and had had a sexual relationship with him throughout that time. Petitioner further testified that over this time period the victim gave him $90,000, bought a washing machine for Petitioner's parents, and bought Petitioner four cars. Petitioner testified that the victim had provided religious and psychological counseling, including psychohypnosis, for him on various matters. Petitioner testified that he and the victim drank together almost every time they met. He testified that he knew nothing about the murder, and that he could not remember that day at all. Petitioner testified that to his knowledge, he was not violent after his seizures, nor had he been told that he was. Tr. at 627-719.

Petitioner's mother testified that Petitioner had begun having mental health problems when he was eight years old. He had been treated in multiple hospitals and put on medication. When he was about 20 years old, Petitioner suffered a head injury from a car accident that caused a change in his behavior, so that "he didn't know what he was doing half the time anymore," and would run around saying people were trying to kill him. Petitioner's mother testified that she first met the victim about six years prior to the

---

[3]    In the record, the tape is referred to as 90-minutes long and as including more than one conversation. The transcript of the tape in the record before the Court only records one conversation, which the Court estimates would have lasted approximately 25 minutes.

murder, that the victim and Petitioner saw each other three or four times a week, and that the victim gave Petitioner several presents over the years, including $5,000 in the month before the murder.  Tr. 796-801.

Petitioner's mother testified that after the car accident Petitioner began having seizures and passing out, and that his problems and behavior got increasingly worse over the years.  She testified that she had taken Petitioner to almost every hospital in the city for treatment.  He would typically be tied to a gurney, given Dilantin (an antiepileptic drug), and released when he calmed down.  During these episodes, Petitioner often thought that he was God, and he would not know his name or who his family members were.  Tr. at 793-808.

Petitioner's mother testified that when Petitioner came home on the day of the murder, he was wild-eyed, and that he thought he was God, taking some people to the kingdom of heaven.  She further testified that she did not see any blood on his clothing.  Tr. at 809-812.  Petitioner's father and brother each offered substantially similar testimony.  Tr. at 881-913, 952-63.  Each family member testified that Petitioner had not been violent towards them during a seizure or otherwise.

Petitioner's former girlfriend testified that Petitioner had been violent toward her after a seizure, six months before the murder.  On that occasion, she pointed at him and told him to go to bed, and he grabbed her arm, twisted it, and swung it so that it hit the sink.  She filed a complaint with the police, leading to Petitioner's arrest.   She also testified that Petitioner's seizures and behavior had steadily gotten worse over the seven

years that she knew him. The former girlfriend testified that Petitioner had beaten her in the past when he had been drinking, and that sometimes the drinking caused seizures and afterwards he would not remember having hit her. She also testified that other than the incident occurring after the seizure that led to Petitioner's arrest, he was not violent towards her when he had not been drinking. Tr. at 1011-37.

The police officer who arrested Petitioner on the domestic abuse charge testified that Petitioner identified himself as God to the officer and told him that he "abducted the children" and stated, "I'm sorry I molested them, I did not mean to kill her but I am the promise," and "I am the promise and the children come unto me to the palace and they do construction work." Petitioner violently resisted arrest, requiring three police officers to subdue him. Tr. at 774-89.

Expert Mental-Health Evidence

Prior to trial, defense counsel disclosed the name of Dr. Allan Barclay, a clinical psychologist, as an expert witness with regard to Petitioner's mental capacity defense. The State named Dr. Sam Parwatikar, a psychiatrist certified in neurology and forensic psychiatry, as its mental health expert. Several days before trial, as well as during the trial itself, defense counsel named approximately 12 new witnesses he intended to call, including Denise Hacker, a social worker at the mental health facility where Plaintiff had been treated in late 1993; Dr. Young Kim, a psychiatrist at the same facility; and Drs. Eric Genden and Jorge Viamontes, who were on duty at the hospital to which Plaintiff was brought on the day of the murder. The prosecutor objected to allowing these witnesses to

testify due to their late endorsement.  In explaining the reason for the late endorsement, defense counsel stated that he thought the names of Ms. Hacker and Dr. Kim had been given to the prosecutor by the Public Defender earlier in the case, and that he had had a hard time locating Drs. Genden and Viamontes.  Tr. at 608-16; 757-62; 840-49; 856-57.

The trial court sustained the State's objection to having these witnesses testify, but ruled that Petitioner could use the related medical records during Dr. Barclay and Dr. Partiwakar's testimony, "for whatever purpose."  Tr. 874-77.  In fact, during trial defense counsel did not refer to any medical records documenting Plaintiff's mental problems.

Petitioner's Medical Records

The record before the Court includes the following medical reports, among others, about Petitioner's mental problems:

(1) April 12-21, 1992, Malcom Bliss Mental Health Center

This report relates that on April 12, 1992, Petitioner was picked up by police and taken to the emergency room after he chased an elderly female and a child on the street and was observed kicking cars.  He was admitted to the hospital on an involuntary basis.  At that time, Petitioner had not been complying with his medication.  Progress notes from April 14 state that Petitioner was exhibiting "bizarre behavior and physical aggression."  The report states that Petitioner's confusion and psychotic symptoms cleared up after a therapeutic Dilantin level was achieved.  The report also notes that Petitioner did not recollect having chased anyone prior to admission.  Resp. Ex. Q at 26-110.

(2)  December 9, 1992, Malcom Bliss Mental Health Center

On December 9, 1992, Petitioner was transferred to the state mental hospital after being brought to another hospital complaining of seizures.  Petitioner attacked a male staff member without reason, and was then placed in leather restraints for several hours and medicated with Dilantin.  Resp. Ex. Q. at 14-21.

(3)  November 16-26, 1993, Southeast Missouri Mental Health Center

On November 16, 1993, Petitioner was taken to the emergency room by police for psychological treatment after damaging a police car while trying to break its windshield.  According to accompanying court papers, Petitioner, without provocation, began striking and beating another individual.  During the assault, Petitioner reportedly became "violent, combative, scream[ed], yell[ed]," and then became suddenly calm and quiet.  Petitioner was brought to the hospital in handcuffs.  When the handcuffs were removed, he began beating the walls with his fist, yelling and threatening the medical staff.  Petitioner was immediately sedated and given Dilantin and Thorazine (an antipsychotic drug used for the treatment of schizophrenia).  The medical records report that when Petitioner would stop taking his medication, his condition exacerbated and his aggressive behavior became paramount.  He was described as having "questionable judgment," "poor impulse control," and "frequent temper outbursts."  Resp. Exs. N. and O.

(4)  December 27-28, 1993, Phelps County Regional Medical Center

On December 27, 1993, following the domestic violence arrest related at trial, Petitioner was taken to the hospital by the police.  The medical records describe him as

angry, combative, delusional ("I killed the kids . . . I don't kill unless the Lord tells me he needs them;" "I'm doing the Lord's work"), and homicidal. He was placed in leather restraints and given Dilantin, Thorazine, and Lorazepam (an antianxiety drug also used to treat epilepsy). Resp. Ex. N.

(5) March 12, 1994, Barnes Medical Center

This report states that Petitioner was admitted to the emergency room with a right frontal hematoma and confusion. Petitioner was physically and verbally combative. He was placed in leather restraints and given Dilantin. Resp. Ex. P.

(6) June 3, 1994, St. Louis Regional Medical Center

The hospital records from the day of the murder show that Petitioner's medication level was significantly below therapeutic level. The admitting physician noted that Petitioner was "alert, not oriented to person/time/place," and diagnosed Petitioner with "florid psychosis." Petitioner was given Dilantin and Thorazine. Resp. Ex. M.

As noted above, none of these reports or their contents were referred to by defense counsel during trial.

Dr. Barclay's Testimony

Dr. Barclay testified for the defense. He testified that in diagnosing Petitioner, he relied upon reports from psychologists, psychiatrists, hospitals, and the police, as well as upon his interviews with lay witnesses and Petitioner. Dr. Barclay had met with Petitioner on March 24 and April 28, 1995, and performed the Wechsler Adult Intelligence Scale Revised, the Wechsler Memory Scale, the Minnesota Multiphasic Personality Inventory,

the Rorshacht Projective Test, and the DES Scale. Tr. at 1152-57, 1181. Dr. Barclay testified that the results of these tests revealed that Petitioner had a full scale IQ of 76 (lower borderline range); that his short-term memory was impaired; that he had periods of amnesia; and that there were times when Petitioner was not fully in contact with reality, possibly due to psychotic episodes. Tr. at 1162-69, 1181-82. Specifically, Dr. Barclay diagnosed Petitioner with "an organic personality disorder subsequent to the seizure disorder and the history of substance abuse in the past and the trauma that [Petitioner] experienced." Tr. at 1185.

Dr. Barclay opined that Petitioner suffered from a mental disease or defect, and that he was suffering from said defect on June 3, 1994, the day of the murder. Dr. Barclay stated that the mental defect would have "compelled" Petitioner to act or not act in a certain way on the day of the murder. In addition, the "retrograde amnesia" associated with the seizure disorder could have prevented Petitioner from remembering the events in question. Dr. Barklay testified that the combination of Petitioner's limited mental ability, seizure disorder, and organic personality disorder "would have precluded the logical, rational approach, the planning of any kind of activity" or "[calmly] thinking about something and carrying it out." Tr. at 1203-1207.

During cross-examination, Dr. Barclay stated that Petitioner's psychosis was episodic and that it manifested itself after seizures, which Dr. Barclay characterized as grand mal seizures. Dr. Barclay testified that Petitioner's motor coordination would be poor during the "postictal" stage following a seizure, the same stage during which

Petitioner would be psychotic, explaining that the term postictal was elastic and usually referred to the time period closely following a seizure.  Dr. Barclay stated that he could not testify whether on June 4, 2004, Petitioner was in a reality phase or a nonreality phase, because he (Dr. Barclay) was not there.  Tr. at 1223-34.

Dr. Barclay testified that his interviews and review of Petitioner's records indicated that there had never been "a pattern of violence" in Petitioner's past, that Petitioner's nonreality stages after a seizure were nonviolent in nature, and that violent behavior in the period immediately following a seizure is extremely rare.  He stated that he did not find any reports of a violent episode in Petitioner's past during the period when he would say things like that he was God following a seizure.  Tr. at 1249-1251, 1257.

Dr. Barclay further testified on cross-examination that one of Petitioner's symptoms was amnesia for the period before, during, and after a seizure, and that if Petitioner's mental disease or defect caused him to go into a nonreality state on the day of the murder, he should not have been able to remember what his did on that day.  Dr. Barclay acknowledged that according to Dr. Partiwakar's report, Petitioner did recall the events of that day.  Tr. at 1252-53.

On redirect, Dr. Barclay explained that Petitioner's intermittent psychotic episodes were manifestations of the organic brain damage and seizure disorder.  Dr. Barclay testified that he believed that Petitioner was in a psychotic state when he left this home on the day of the murder and when he returned.  In this state, a person could drive a car and beat someone over the head, but would not have good impulse control, would not be able

to distinguish between reality and fantasy, and would not be able to make a specific plan and carry it through. Tr. at 1261-65.

Dr. Parwatikar's Testimony

Dr. Parwatikar testified for the State as a rebuttal expert witness. He had interviewed Petitioner five times between October 1994 and July 1995, and diagnosed Petitioner with "personality disorder due to organic factors or a medical condition, which is head injury and seizure disorder" as well as with polysubstance abuse and epilepsy. Tr. at 1284. Dr. Parwatikar testified that during a seizure, Petitioner would not be conscious of what was happening to him, and would have no control over his bodily functions. As he was coming out of a seizure, he would be confused and have "paranoid ideation." Because of Petitioner's alcohol and substance abuse, in combination with his organic factor, he had poor judgment, became irritable, acted impulsively, and at times seemed to make statements which did "not seem to be related to . . . the actual realties." Tr. at 1286.

Dr. Parwatikar testified that in reviewing Petitioner's medical records, he saw no evidence of amnesia with respect to events preceding a seizure. He further testified that he saw no episodes in the 1990s or late 1980s when Petitioner's psychosis manifested itself with violent behavior. Dr. Parwatikar reiterated that there was nothing in any of Petitioner's medical or psychological records that he ever physically, purposefully attacked another person. Tr. at 1287-91.

Dr. Parwatikar testified that during a seizure as well as in the postictal stage, an individual would not be able to enunciate words clearly or drive a car (as Petitioner had

done after the murder). Dr. Parwatikar also testified that according to Petitioner's medical history, his psychotic stages usually lasted anywhere between two hours and two days. Tr. at 1292-94. Dr. Parwatikar testified that Petitioner initially told him that on June 3, 1994, he and the victim had Petitioner's car fixed, returned to the victim's house and talked, and then Petitioner went home and had a seizure. During the July 12, 1995 interview, Petitioner presented a somewhat different version, stating that after he and the victim returned to the victim's house, they had a few drinks and talked, and Petitioner woke up on the couch after a seizure and realized the victim was speaking to him. Petitioner then said that the next thing he realized was that he woke up and "found the victim in blood" and had a feeling that the victim was dead. Tr. 1296-1301.

On cross-examination, the only information elicited by defense counsel was that Dr. Parwatikar had been paid by the State for his work in connection with this case; that he had testified in over 200 trials, usually for the defense; and that approximately fifty percent of his income came from the State. Tr. at 1306-08.

Closing Arguments

During closing argument, the prosecutor stated as follows:

> Something happened that made the defendant again extremely angry, angry enough to pick up that fireplace poker from the set that sat there on the mantle and attack Ken Reeves with the fireplace poker brutally, brutally. Imagine the force, ladies and gentlemen of the jury, as it drove pieces of the skull back into his brain . . . as it fractured the very base of the skull with the force and intensity of those blows . . . . Imagine the savage force of those repeated assaults on Ken Reeves, five, six, who knows, several multiple force -- multiple strikes on his head with that fireplace poker with that claw at the end of it.

Imagine Ken Reeves in his wheelchair, paraplegic, unable to defend himself . . . can you imagine the shock, the total terror and the pain when he was first struck with that fireplace poker?  If he came at him from the front, ladies and gentlemen, can you imagine the sheer terror of sitting there in that chair with your hands folded across your front and watching this man come at you with this weapon and to strike you and to beat you like that and the pain it must've caused.

    *    *    *

He was either taken from behind or he watched his killer walk up to him and strike him with that fireplace poker.  This was, and I'll say it again, and I'll probably say it more, a brutal, brutal attack.  This is not the way anybody wants to go.

    *    *    *

As he's hitting Ken Reeves with his fireplace poker, crashing sound of the bone breaking, the blood splattering, he has got to think to bring his arm back and hit him again, bring his arm back and hit him again, bring his arm back and hit him again.  You know what happened.

Tr. 1335-38, 1367.  Defense counsel did not object to any of these comments.

In his closing argument, defense counsel first argued that the evidence did not establish beyond a reasonable doubt that Petitioner was the perpetrator.  Counsel then focused on the mental health defenses.  Tr. 1342-61.

Jury Instructions

The jury was instructed that they could not find Petitioner guilty of first-degree murder if they believed he was not guilty by reason of a mental disease or defect excluding responsibility.  The jury was further told that if they did not find Petitioner guilty of first-degree murder, they had to consider whether he was guilty of second-degree murder, again instructing the jury that they could not find him guilty of second-degree murder if they

16

believed he was not guilty by reason of a mental disease or defect. Resp. Ex. at 43, 47.

Under Missouri law, finding a defendant guilty of first-degree murder requires a finding

that he "knowingly cause[d] the death of another person after deliberation upon the matter."

Mo. Rev. Stat. § 565.020. "Deliberation" is defined as "cool reflection for any length of

time no matter how brief." Id. (3). Second-degree murder does not require "deliberation."

Id. § 565.021.

In addition, the jury was told that if they did not believe that Petitioner lacked

responsibility by reason of a mental disease or defect, they could still consider whether he

had a mental disease or defect in determining whether he was able to deliberate, as required

for a finding of guilty of first-degree murder. Resp. Ex. B at 53. On June 8, 1996, the jury

returned verdicts of guilty of first degree murder and armed criminal action.

**Motion for New Trial and Direct Appeal**

Petitioner was granted an extension of time until July 5, 1996, to file a motion for a

new trial. Resp. Ex. A at 97.[4] The motion was filed July 8, 1996.[5] On direct appeal,

---

[4]    Missouri Rule of Criminal Procedure 29.11(d) requires that a motion for a new trial be filed within fifteen days of the jury's verdict.

[5]    In this motion, Petitioner claimed the trial court had committed error by: denying Petitioner's motion for acquittal due to insufficient evidence; failing to strike the venirepanel after a member stated that he did not believe in mental capacity defenses; failing to grant a mistrial after the prosecutor stated during void dire that the defense planned to argue that although Petitioner committed the murder, he should be found not guilty by reason of mental disease or defect; excluding Petitioner's statement to Dr. Barclay that Petitioner had killed Angie Hausman; admitting photographs of the victim and the crime scene; admitting the taped conversations between Petitioner and the victim's wife; excluding Petitioner's late-named witnesses; and limiting Petitioner to only

Petitioner argued that the trial court erred in the following four ways, each of which violated Petitioner's federal constitutional right to a fair trial: (1) excluding the testimony of the defense's additional mental health experts as a sanction for their late endorsement; (2) admitting the taped conversations between Petitioner and the victim's wife; (3) denying Petitioner's motion for a mistrial following the prosecutor's statement during voir dire that the defense planned to rely on the defense that although Petitioner committed the murder, he should be found not guilty by reason of mental disease or defect; and (4) failing to <u>sua sponte</u> declare a mistrial following the above-quoted comments by the prosecutor during closing argument personalizing the crime. Resp. Ex. D.

The State responded to all four points on the merits and did not argue that Petitioner was precluded from raising them by filing an untimely motion for new trial. In affirming Petitioner's convictions, the Missouri Court of Appeals summarily stated that it had reviewed the briefs of the parties, the legal file, and the record on appeal, and found the claims of error to be without merit. Resp. Ex. F.

## State Post-conviction Proceedings

In his amended motion for state post-conviction relief, prepared with the assistance of counsel, Petitioner raised several claims of ineffective assistance of trial counsel, including the three claims presented in the present habeas petition: that counsel was ineffective in failing to (1) competently present defenses of diminished capacity and not

---

one witness to testify about Petitioner's behavior at jail after his arrest. Resp. Ex. A at 105-120.

guilty by reason of mental disease or defect; (2) object to the prosecutor's above-quoted closing argument as inflammatory; (3) file a timely motion for a new trial and thereby preserve trial errors for appeal.

With regard to the first claim, Petitioner pointed to trial counsel's failure to introduce Petitioner's medical records; rehabilitate Dr. Barclay with respect to his testimony on cross-examination that, among other things, Petitioner did not have a history of violence associated with his psychotic episodes, and that Petitioner's psychotic episodes were confined to the postictal stage of a seizure; cross-examine Dr. Partiwaker with respect to his testimony that, among other things, Petitioner did not have a history of violence during his psychotic episodes, and that his psychotic episodes lasted from two hours to two days.     Resp. Ex. I at 41-125.[6]

Evidentiary Hearing

Defense counsel and Dr. William Logan, a psychiatrist specializing in forensic psychiatry, testified at the evidentiary hearing on Petitioner's post-conviction motion.[7]  Dr.

---

[6]     Petitioner also asserted that (1) trial counsel was ineffective in presenting inconsistent defenses of actual innocence and insanity/diminished capacity, (2) appellate counsel was ineffective in failing to appeal the trial court's ruling preventing Dr. Barclay from explicitly discussing Petitioner's capacity to deliberate, and (3) trial counsel was ineffective in failing to object to the State's improper elicitation of victim impact evidence at trial.  Resp. Ex. V at 2-3, 7-8.  These claims were rejected by the state courts and are not raised here.

[7]     Petitioner also presented the testimony of his direct appeal counsel, who testified that the failure was a matter of negligence on her part.  This issue is not presently before the Court.

Logan stated that he had been asked by Petitioner's post-conviction counsel to evaluate Petitioner's mental state on the day of the murder. Dr. Logan stated that he conducted a three and one-half hour interview with Petitioner, upon which he relied primarily in forming an opinion about Petitioner's history. To form an opinion on Petitioner's mental state on the day of the murder, Dr. Logan relied upon hospital records, the testimony at trial, and the reports of the mental health experts who testified. Dr. Logan diagnosed Petitioner with a seizure disorder, which developed into an organic personality disorder with periodic organic psychosis during times when Petitioner was having uncontrolled seizures. Dr. Logan opined that Petitioner did not have the ability to deliberate on June 3, 1994, and stated that his diagnosis was within the definition of mental disease or defect in Mo. Rev. Stat. § 552.030. PC Tr. at 29-30.

Dr. Logan explained that after a number of years of having seizures, individuals like Petitioner develop features of organic personality disorder, which include paranoia and an inability to satisfactorily interact with others. He went on to explain that when Petitioner would have a number of uncontrolled seizures, he would develop "frank psychotic symptoms," which would include believing he was God, and "paranoid, persecutory" ideas. During these times, Petitioner would require hospitalization. PC Tr. at 31-32.

Dr. Logan reviewed Petitioner's medical history, which indicated a family history of seizures; and the early presence of brain damage, exacerbated by head trauma from the car accident in 1981, after which Petitioner's seizures began. Dr. Logan noted that it is more usual to see organic personality disorders in individuals who have had epilepsy for some

time, and especially if the epilepsy were poorly controlled, factors which were both present in Petitioner's case.  PC Tr. at 32-39.

Dr. Logan testified that Petitioner experienced partial and generalized seizures (which used to be called grand mal seizures), for which drug therapy was the only treatment.  Dr. Logan noted that the medical records indicated that Petitioner was not compliant with his Dilantin regimen.  He explained that Petitioner's organic psychosis was not an ongoing condition, but would go away with medication for both the psychosis and the seizures; whereas his organic personality disorder would not be influenced by medication, but would be less prominent over time if Petitioner consistently took medication.  PC Tr. at 40-48.

Dr. Logan testified that Petitioner's medical records indicated that when Petitioner was psychotic, he would become hyper-religious and obsessive about the molestation he experienced in his youth.  Dr. Logan stated that this was evidenced by Petitioner's comments about the victim following the murder.  Dr. Logan repeated that when Petitioner was having a psychotic episode, he had to be hospitalized and given medication.  The symptoms would then resolve within a few days, but not immediately.  PC Tr. 53-56.

Dr. Logan opined that on the day of the murder, Petitioner was suffering from psychosis resulting from uncontrolled seizures.  Dr. Logan stated that Petitioner's statement accusing his mother of poisoning him indicated a psychotic episode.  Dr. Logan testified that on June 3, 1994, Petitioner would not have been able to appreciate the nature, consequences, or wrongfulness of his conduct.  When Petitioner became paranoid, his

21

beliefs about a person became distorted, and he could not determine how to behave.  Tr. at 57-65.

Dr. Logan stated that the testimony at trial indicating that Petitioner had no prior history of violence associated with psychosis was the opposite of his conclusion based upon a review of the medical records.  Dr. Logan then cited the medical records that showed violent episodes associated with psychosis, including the records dated March 12, 1994, November 16, 1993, and April 14, 1992, described above.  He stated that the testimony that Petitioner was not violent when psychotic was unsupported by the record, and also unsupported by Dr. Logan's experience, as individuals experiencing psychotic episodes, particularly if they also experience paranoia, commit violent acts.  PC Tr. at 68-73.

Dr. Logan testified that Petitioner's psychotic episodes would last until he was given treatment, contrary to Dr. Barclay's testimony during cross-examination, suggesting that Petitioner's mental disorder would be confined to the postictal stage of a seizure.  Dr. Logan also testified that Dr. Parwatikar's statement that Petitioner's psychotic episodes could last from two hours to two days was not only inconsistent with Petitioner's medical history, but was also medically untrue.  Dr. Logan stated that there was no place in the record that indicated that Petitioner's psychotic episodes would resolve without treatment. PC Tr. 74-79.

Dr. Logan disagreed with Dr. Parwatikar's contention that there was no evidence of retrograde amnesia associated with Petitioner's seizures, and with his contention that

22

Petitioner's ability to enunciate clearly following the murder indicated that he was not in a psychotic state. Tr. at 91-95.

The State presented defense counsel as its witness. He testified that he did not introduce evidence of Petitioner's past acts of violence because he did not believe the evidence was necessary for an expert to form an opinion as to whether Petitioner could have had intent or controlled his actions. Defense counsel explained that because many people perform violent acts in the absence of psychosis, he believed introducing Petitioner's past incidents of violence would only tarnish Petitioner's image with the jury. PC Tr. at 166-68.

When asked why he did not seek to have Petitioner's medical records introduced as evidence, trial counsel responded, "those that were necessary to arrive at the medical opinion were introduced. Beyond that, I saw no need for it." PC Tr. at 169. Defense counsel stated that he believed that there was ample evidence introduced at trial that supported Dr. Barclay's opinion, and that that was what counted. Further, defense counsel did not present the medical records because he had concerns about the length of the trial and felt the jury would be prejudiced toward Petitioner if cumulative and repetitive information were presented. Defense counsel explained he did not feel the medical records were particularly persuasive to a lay juror, and that the average juror looks at medical records as "paper work" and is more interested in "the bottom line." PC Tr. at 170-171.

Defense counsel testified that he decided not to "extensively" cross-examine Dr. Parwatikar because Dr. Parwatiker "projects a very professional image. He's a tall, good-

23

looking man.  He has a very professional demeanor.  He's commanding in his appearance."

Defense counsel felt that to attack such a skilled expert would have been "fruitless" and

would have likely "backfired."  Defense counsel stated that he did not think it was

appropriate strategy to try to rehabilitate his own witness because it would drag out the

length of the trial, bore the jury and get them off track ("You don't want to try a case over

minutia"), and if the witness had made a mistake, rehabilitation could make things worse.

PC Tr. at 171-73.

In response to questioning about his failure to object to the State's closing argument,

Defense counsel explained that "closing argument is sacred ground upon which you should

not trod."  Furthermore, defense counsel stated that it would be a mistake to believe that by

objecting to closing argument it is possible to change a juror's mind in a positive way.

Defense counsel also expressed concern that the jury would have been alienated by an

objection at that point because they wanted to get through with the trial.  PC Tr. at 178-79.

Defense counsel stated that he contacted Petitioner's parents after the trial and told

them to call the Public Defender's office immediately regarding the filing of a motion for a

new trial.  However, after speaking with the Public Defender's office, defense counsel

determined that they could not meet the deadline, and he decided to file the motion himself.

He testified that he tried to file it on (Friday) July 5, 1996, but the courthouse was closed;

he returned the next morning, but the courthouse was still closed.   PC Tr. at 183-87.

<u>Decisions of the Motion Court and Missouri Court of Appeals</u>

The motion court rejected all of Petitioner's claims.[8] With regard to the claim that trial counsel failed to effectively present a mental disease defense, the court noted that counsel presented the testimony of Dr. Barclay, a qualified expert. The court stated that counsel could not "be faulted for failing to shop for a psychiatrist who would testify more favorably," and that, because Dr. Logan's testimony did not "provide a new or unique defense," failure to present his testimony could not establish ineffective assistance of counsel. The court concluded that "decisions as to which expert to call and what issues to explore on direct examination are unreviewable trial strategy." Resp. Ex. I at 134.

The court held that counsel's failure to introduce Petitioner's medical records did not present a ground for relief, noting counsel's testimony at the post-conviction hearing that the records were cumulative evidence, and that their introduction would have lengthened the trial to Petitioner's detriment. <u>Id.</u> at 135.

The court held that trial counsel's failure to substantively cross-examine Dr. Parwatikar and rehabilitate Dr. Barclay was reasonable trial strategy. The court found that

_____

[8] Petitioner notes that the motion court adopted, verbatim, the State's proposed findings of fact and conclusions of law. As recognized by the Eighth Circuit, "[i]mportant evidence is more likely to be overlooked or inadequately considered" when a court adopts verbatim a party's proposed findings of fact and conclusions of law, than when "factual findings are the product of personal analysis and interpretation by the trial judge." <u>Jones v. Int'l Paper Co.</u>,720 F.2d 496, 499 (8th Cir. 1983). Nevertheless, such findings and conclusions are formally the court's. <u>Id.</u>; <u>see also</u> <u>Jolly v. Gammon</u>, 28 F.3d 51, 54 (8th Cir. 1994) (verbatim adoption by state post-conviction court of the state's proposed findings of fact and conclusions of law is not a ground for federal habeas relief).

none of the asserted omissions "would have presented a viable defense," that Petitioner did not establish what the expert witnesses would have stated had other questions been posed, and that trial counsel had valid reasons to avoid prolonging the testimony of the experts. Further, the court held that the omission of certain facts of which Petitioner asserted the jury should have been aware – Petitioner's "tendency to be a confabulator, alcoholic, pedophile, and a propensity for violence" – was reasonable trial strategy. Id.

The court found that, while a portion of the prosecutor's closing argument improperly personalized the crime, this transgression was "brief and isolated" and was not of such a graphic nature as to render failure to object to it ineffective assistance of counsel. The court noted that there is no allegation that the State compounded the error by arguments that contained facts outside the record or misstated the evidence. The court also pointed to trial counsel's testimony that he chose not to object during closing argument for fear of alienating the jury. The court further noted that the appellate court had addressed the issue of personalization on direct appeal, and found that the prosecutor's statements did not warrant awarding a new trial. The court held that Petitioner failed to prove that the prosecutor's remarks were prejudicial, considering the substantial evidence implicating Petitioner that the State presented, and that trial counsel's failure to object did not amount to ineffective assistance of counsel. Id. at 139-41.

The court rejected Petitioner's claim that trial counsel was ineffective for failing to preserve issues for appeal by filing a timely motion for a new trial, because there was no evidence that this in any way prejudiced Petitioner. The court noted that the state did not

argue on direct appeal that any of Petitioner's points were not preserved, and the appellate court ruled on direct appeal that no errors of law appeared. The motion court concurred that no prejudice resulted from any failure to preserve issues, finding that neither the exclusion of Petitioner's witnesses as cumulative, the admittance of the audiotape, nor the refusal to grant a mistrial during voir dire were reversible error. Accordingly, the court stated that it did not have to reach the issue of whether the motion was in fact timely filed. Id. at 141-43.

The Missouri Court of Appeals affirmed the motion court on all points. The appellate court held that trial counsel's presentation of the insanity defense at trial through Dr. Barclay, including counsel's failure to admit Petitioner's medical records and have Dr. Barclay discuss them, did not amount to ineffective assistance of counsel. The court found that the record did not support the claim that Dr. Barclay's trial testimony did not include some of the facts Petitioner claimed counsel should have asked Dr. Barclay about, "for example, [Petitioner's] failure to take his medicine, frequent seizures, multiple seizures the day of the attack, hospitalization shortly after the attack, claiming his mother had poisoned him, etc." The court concluded that other facts, "such as [Petitioner's] alcohol consumption, his sexual molestation as a child, his alleged belief that the victim was evil," were reasonably omitted as potentially prejudicial to Petitioner.

The court "[found] it noteworthy" that Petitioner called a different psychiatric expert at the post-conviction evidentiary hearing, and concluded that some of the matters at issue, such as whether it was the seizures themselves that would trigger a temporary state of

psychosis in Petitioner, reflected differences of expert opinion, rather than facts that trial counsel failed to elicit at trial. Finally, the court found that any alleged deficient performance was not shown to have prejudiced Petitioner, because he failed to demonstrate a reasonable probability that a competent handling of Petitioner's expert witness would have resulted in a different verdict. Rep. Ex. V at 3-5.

The appellate court also held that trial counsel was not ineffective for failing to adequately rehabilitate Dr. Barclay or to substantively cross-examine Dr. Parwatikar. The court stated that this claim was an extension of the argument that counsel had not competently handled Dr. Barclay, and so denied that portion of the claim on the same grounds as above. The court also found that many of the items of Dr. Parwatikar's testimony that Petitioner claimed should have been challenged, such as statements that "violence is not normally possible during a seizure, or that it is nearly impossible for a psychotic person to drive, or that [Petitioner] appeared to be rational and not psychotic when making certain statements to witnesses near the time of the murder, based on the manner in which he made those statements, or that [Petitioner's] psychotic episodes were 'triggered' by seizures," were matters of expert opinion rather than refutable facts. Further, the court found that any attempt to discredit Dr. Parwatikar, given his "commanding presence and impressive credentials," might have backfired by making his testimony seem more convincing. Therefore, the appellate court held that the motion court did not clearly err in finding that defense counsel's "somewhat unusual" failure to cross-examine the witness represented reasonable trial strategy. Id. at 5-7.

The appellate court next turned to Petitioner's claim that trial counsel was ineffective for failing to object to the prosecutor's improper personalization during closing arguments. The appellate court held that the motion court did not err in finding the claim unreviewable, as the issue had been previously raised on direct appeal and the appellate court had found no plain error. Id. at 9. The appellate court further held that the motion court did not err in finding that trial counsel was not ineffective for failing to file a timely motion for a new trial, because any such error did not prejudice Petitioner. Specifically, the court found that there was no merit to the claim that the audiotapes of conversations between Petitioner and the victim's wife should have been excluded as too remote in time and unfairly prejudicial, and therefore failure to preserve that issue did not prejudice Petitioner. Id. at 10. The post-conviction claims not raised in the present habeas petition were also rejected by the state appellate court.

## DISCUSSION

### Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus cannot be granted unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). "AEDPA effected a move toward greater deference in the § 2254 courts' review of state-court decisions." Brown v. Luebbers, 371 F.3d 458, 460 (8th Cir. 2004) (en banc), cert. denied, 125 S. Ct. 1397 (2005).

The "contrary to" clause is satisfied if a state court has arrived "'at a conclusion opposite to that reached by [the Supreme Court] on a question of law'" or "'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent'" but arrives at the opposite result. Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)). A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case. . . . That is, the state court's decision must have been not only incorrect or erroneous, but objectively unreasonable." Rompilla v. Beard, 125 S. Ct. 2456, 2462 (2005) (citations omitted); see also Calvin v. Taylor, 324 F.3d 583, 587 (8th Cir. 2003) (under AEDPA, a writ of habeas corpus may not be granted "unless the relevant state court decision is both wrong and unreasonable"). "The factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to an even more deferential review." Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001). Factual findings by the state court "shall be presumed to be correct, a presumption that will be rebutted only by "clear and convincing evidence." 28 U. S. C. § 2254(e)(1).

**Ineffective Assistance of Counsel**

Petitioner's first claim is that trial counsel was constitutionally ineffective in failing to

competently present defenses of diminished capacity and not guilty by reason of mental disease or defect. The Sixth Amendment guarantees a criminal defendant the right to effective assistance of trial counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To succeed on a claim of ineffective assistance of trial counsel, a habeas petitioner must establish both "that counsel's representation fell below an objective standard of reasonableness," and that but for counsel's deficiency there is "a reasonable probability" that the result of the trial would have been different." Id. at 688.

When addressing the adequacy of counsel's performance, a federal district court must be "highly deferential," and make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Odem v. Hopkins, 382 F.3d 846, 850 (8th Cir. 2004) (quoting Strickland, 466 U.S. at 689). There is a strong presumption that counsel's performance fell "within the wide range of professional assistance." Id. "Lawyers are not perfect, and the Constitution does not guarantee a perfect trial." Jones v. Delo, 258 F.3d 893, 902 (8th Cir. 2001); see also Whitfield v. Bowersox, 324 F.3d 1009, 1018 (8th Cir. 2003) (although not perfect, counsel's performance was not constitutionally deficient). "Reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful." James v. Iowa, 100 F.3d 586, 590 (8th Cir. 1996). However, "counsel must exercise reasonable diligence to produce exculpatory evidence, and strategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." Kenley v. Armontrout, 937 F.2d 1298, 1304 (8th Cir.

1991).

Error by counsel, even if professionally unreasonable, does not necessarily require that a judgment be set aside.  "[A] defendant must affirmatively show prejudice.  It is not sufficient for a defendant to show that the error had some 'conceivable effect' on the result of the proceeding. . . .  The defendant must show that because of counsel's error, there is a reasonable probability that the result of the proceeding would have been different.  'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Strickland, 466 U.S. at 686; see also King v. Kemna, 266 F.3d 816, 823 (8th Cir. 2001); Jones, 258 F.3d at 901.

Moreover, in the context of a § 2254 petition, a petitioner "'must do more than show that he would have satisfied Strickland's test if his claims were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner.'"  Underdahl v. Carlson, 381 F.3d 740, 742 (8th Cir. 2004) (quoting Bell v. Cone, 535 U.S. 685, 698-99 (2002)).

Accordingly, in the present case, Petitioner must show that it was objectively unreasonable for the state courts to conclude that (1) trial counsel performed competently, and (2) there was no reasonable probability that competent performance by defense counsel would have resulted in a verdict of not guilty of first-degree murder.  See Jones, 258 F.3d at 901.

## Insanity/Diminished Capacity Defenses

Under Missouri law, a defendant is not responsible for his conduct if, as a result of a "mental disease or defect," such person was "incapable of knowing and appreciating the nature, quality or wrongfulness of his conduct."  Mo. Rev. Stat. § 552.030.1.  The statute defines "mental disease or defect" as follows:

> The terms "mental disease or defect" include congenital and traumatic mental conditions as well as disease. They do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, whether or not such abnormality may be included under mental illness, mental disease or defect in some classifications of mental abnormality or disorder. The terms "mental disease or defect" do not include alcoholism without psychosis or drug abuse without psychosis or an abnormality manifested only by criminal sexual psychopathy. . . .

Mo. Rev. Stat. § 552.030.1.

A "diminished capacity" defense permits a defendant to introduce evidence of a mental disease or defect to prove the absence of a particular mental element of the crime, such as "deliberation," which is an element of first-degree murder.  Unlike the defense of "not guilty by reason of insanity," the defendant accepts criminal responsibility for his conduct, but is convicted of a lesser crime because the mental defect prevented the defendant from forming the mental element of the higher degree crime.  Wilkins v. Bowersox, 933 F. Supp. 1496, 1517 n.18 (W.D. Mo. 1996) (citing State v. Anderson, 515 S.W.2d 534, 537 (Mo. 1974)).

A "defense of diminished capacity because the accused is incapable of forming the mental element necessary to commit a crime is necessarily based on evidence of a mental

disease or defect as defined in § 552.010." State v. Erwin, 848 S.W.2d 476, 480 (Mo. 1993)

(en banc); Khaalid v. Bowersox, 259 F.3d 975, 978 (8th Cir. 2001). Under the defense of

diminished capacity, a finding of mental disease or defect would permit the jury to conclude

that appellant was unable to form the necessary specific or general intent and to thereby

acquit him of the offense charged; "[t]he jury must still determine, considering all the

evidence, whether that mental disease or defect prevented the defendant from forming the

requisite mental state at the time of the offense." Wainwright v. State, 143 S.W.3d 681, 685

n.1 (Mo. Ct. App. 2004) (quoting Nicklasson v. State, 105 S.W.3d 482, 484-85 (Mo. 2003)

(en banc)).

Here, the Court finds unreasonable the state courts' determination that trial counsel's

presentation of Petitioner's insanity and diminished capacity defenses was not deficient. The

failure to name the excluded mental health witnesses on time was clearly not a matter of trial

strategy. There was little justification for this failure, as this attorney represented Petitioner

for more than one and one-half years prior to trial, and at least some of the names were

apparently provided to him by the public defender. Nevertheless, in excluding these

witnesses, the trial court instructed defense counsel that even though the witnesses who

prepared the reports would be excluded as untimely named, counsel could introduce the

contents of Petitioner's mental health records in conjunction with the testimony of the experts

who would be testifying. Defense counsel, however, failed to do this. The reasons offered

by counsel at the post-conviction hearing were that he believed the records were cumulative,

that they would bore the jury, and that prolonging the trial by introducing the records would

turn the jury against Petitioner.

The state motion court summarily concluded that these reasons did not provide grounds to grant post-conviction relief to Petitioner.  The state appellate court dealt with this issue by noting that some of the facts in the medical records that Petitioner claimed should have been elicited from Dr. Barclay (e.g., Plaintiff's failure to take his medicine, his multiple seizures and hospitalization on the day of the murder), were, in fact, included in Dr. Barclay's testimony.  The court also noted that other facts in the records (e.g., Plaintiff's alcohol consumption) could have prejudiced the jury against Petitioner.  The undersigned finds little support for some of the appellate court's factual findings.  For example, although the appellate court suggests that Dr. Barclay, in fact, testified that Petitioner had not taken his medication, this Court finds no such testimony by Dr. Barclay.  Nor did Dr. Barclay testify to multiple seizures on the day of the attack.

More importantly, neither court addressed the highly probative evidence in the omitted medical records, namely, the multiple incidents of Plaintiff's violent behavior connected to his mental problems, the "florid psychosis" and non-orientation "to person/place/time" observed by the admitting physician at the hospital several hours after the murder, and the fact that his medication was found to be significantly below therapeutic level at the time.

The Court believes that a finding that defense counsel's failure to admit the contents of Plaintiff's medical records was a reasonable trial strategy is objectively unreasonable.  At the post-conviction hearing, trial counsel himself seemed to think that he introduced at least

some of the records but, in fact, he did not. The reasons offered by defense counsel and accepted by the motion court for not introducing the relevant medical records -- namely, that they were cumulative, would bore the jury, and would prolong the trial -- are objectively unacceptable as reasonable trial strategy in this case. The import of these records cannot be overstated, especially where both the experts and Petitioner himself disclaimed any history of violence during these episodes – a fact the medical records contradicts. Moreover, dismissing the information as cumulative cannot be justified where much of Petitioner's medical history came in only through the testimony of family and friends, more easily dismissed as biased than the years of documented medical history. Nor can a desire not to prolong the trial justify the complete failure to introduce any records whatsoever to support petitioner's main defense, especially where, as here, such records demonstrate a persistent pattern of bizarre and violent behavior by Petitioner when not properly medicated.

Furthermore, defense counsel's virtual failure to cross-examine the State's mental health expert is hard to justify as reasonable trial strategy. At the state post-conviction hearing, counsel stated that he did not cross-examine Dr. Partiwarkar because he believed that cross-examining such an impressive witness would have alienated the jury. The state appellate court acknowledged that this strategy "may be somewhat unusual," but nevertheless concluded that counsel's decision fell within the range of reasonable trial strategy.

This Court finds this conclusion unreasonable. A desire not to alienate the jury is certainly a goal of every defense attorney. However, this goal could be accommodated by a reasonably skillful, nonaggressive cross-examination. The failure to do so is especially

egregious when the witness's testimony left much room for effective impeachment. Dr. Partiwakar's testimony that Plaintiff's medical records showed no history of violent conduct associated with a mental disorder is refuted by the records themselves. As stated above, Petitioner's medical records indicate several occasions on which Petitioner's psychotic episodes were accompanied by assaultive behavior. One record even noted homicidal behavior.

Having concluded that defense counsel's performance with regard to presenting a mental health defense was constitutionally deficient, the Court must evaluate the state courts' decisions with regard to whether Petitioner established prejudice resulting from trial counsel's deficient performance. The appellate court found that Petitioner failed to meet his burden of demonstrating prejudice because there was sufficient evidence of Defendant's sanity at the time of the offense. But this finding ignores the fact that the evidence came solely from the state's expert, whose testimony would have been significantly undercut through proper use of the medical records.

Furthermore, this is not a case in which the evidence of guilt of first-degree murder was strong. To be sure, the evidence that Petitioner was the perpetrator was overwhelming; the evidence of planning or deliberation, however, was not. Aside from the prosecutor's speculation that Petitioner had been blackmailing the victim, and that the victim may have refused to pay him more money, the only evidence of planning or deliberation is the taped conversations between Petitioner and the victim's wife from several years before the murder. In light of the intervening years of interaction and friendship between Petitioner and the

victim, this can hardly be characterized as strong evidence of deliberation some seven years later.  Cf. Jones, 258 F.3d at 903 (even though counsel may have been ineffective in failing to present diminished capacity defense in first-degree murder case, prejudice prong of ineffective assistance claim was not met where there was strong evidence of planning and deliberation).  Against this scant record of deliberation, defense counsel's deficient performance leaves the undersigned with little confidence in the outcome of the proceeding, and any contrary finding appears objectively unreasonable.

In sum, this Court believes that the state courts' adjudication of Petitioner's claim that trial counsel rendered ineffective assistance in failing to competently present a diminished capacity defense involved an objectively unreasonable application of Strickland.  The conclusion reached by the state courts – that there is no reasonable probability that Petitioner would not have been found guilty of first-degree murder had the jury been aware of Petitioner's mental health history as reflected in the medical records in this case – is a conclusion this Court finds to be factually and legally unreasonable.

**Failure to Object to the Prosecutor's Closing Argument**

The Supreme Court has ruled that in order to be a constitutional violation, a statement by a prosecutor must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).  The Supreme Court listed several factors to consider in determining whether a misstatement by a prosecutor was so egregious that it required a new trial as a matter of constitutional law:  (1) whether the

prosecutor's statement manipulated or misstated the evidence; (2) whether the remarks implicated specific rights of the accused such as the right to counsel or the right to remain silent; (3) whether the defense invited the comment; (4) instructions given by the trial court; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut the statement. Id. at 181-82.

As noted above, the state appellate court summarily rejected this and all other arguments raised on direct appeal. For purposes of habeas review, that summary decision is presumed to have been on the merits. See Carter v. Bowersox, 265 F.3d 705, 712 (8th Cir. 2001). Upon review of the record, this Court concludes that Petitioner cannot establish that the outcome of the trial probably would have been different but for counsel's failure to object to the prosecutor's closing argument. See Roberts v. Bowersox, 61 F. Supp. 2d 896, 913-914 (E.D. Mo. 1999) ("personalization of the victim's suffering could not have added appreciably to the impact of the horrific facts of the crime. Therefore, petitioner has failed to demonstrate ineffective assistance of counsel"). The state court's rejection of this claim was not factually or legally unreasonable.

**Failure to File a Timely Motion for New Trial**

The Court also does not believe that the state courts' adjudication of this claim was unreasonable. As the Missouri Court of Appeals stated, there is no evidence of any prejudice to Petitioner resulting from the date of the filing of the motion for new trial.

## CONCLUSION

Petitioner received ineffective assistance of trial counsel due to a combination of

counsel's failure to introduce medical records establishing Petitioner's psychotic state on the day of the murder and violent behavior associated with Petitioner's psychotic episodes, and failure to effectively cross-examine the State's mental health expert. The state courts' conclusion to the contrary is objectively unreasonable.

Accordingly,

**IT IS HEREBY ORDERED** that Richard Marcrum's petition for a writ of habeas corpus is **GRANTED**.

**IT IS FURTHER ORDERED** that the State of Missouri shall have the option of re-trying Petitioner within 90 days of the date of this Memorandum and Order, or releasing him.

A separate document granting the writ shall accompany this Memorandum and Order.

The Court expresses its gratitude to Petitioner's appointed attorney for his dedicated representation of his client and assistance to the Court.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of September, 2005.